FRANKFURT KURNIT KLEIN & SELZ P.C.
Ronald C. Minkoff (RM-2943)
Jessie F. Beeber (JB-3129)
Lia N. Brooks (LB-0618)
488 Madison Avenue, 10th Floor
New York, New York  10022
Telephone:  (212) 980-0120
Facsimile:  (212) 593-9175
E-mail:  rminkoff@fkks.com
E-mail:  jbeeber@fkks.com
E-mail: lbrooks@fkks.com

*Attorneys for BCI International Holdings, Inc.*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
    :
BCI INTERNATIONAL HOLDINGS,  :
INC.,    :
    :
      Plaintiff,  :
    :
    :
  v.  :
    :
EDWARDS ANGELL PALMER & DODGE  :
LLP, a New York Limited Liability Partnership :
and D. ROGER GLENN,  :
    :
    :
      Defendants.  :
    :
    :
------------------------------------------------------ x

**Judge Berman**



Case No. CIV 3892

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff, BCI International Holdings, Inc., through its undersigned counsel, for its

Complaint against the above-named Defendants, states and alleges as follows:

## I. PARTIES

1.    Plaintiff, BCI International Holdings, Inc. ("BCI") is a Delaware corporation

having its principal place of business at 5750 Fleet Street, Carlsbad, California.  At all relevant

times, BCI engaged in the business of developing, producing, and selling natural fiber

composites and related products.

2.      Upon information and belief, defendant Edwards Angell Palmer & Dodge LLP, which is a successor of the law firm Edwards & Angell LLP (collectively "EAPD"), is a New York limited liability partnership, having its principal place of business at 750 Lexington Avenue, New York, New York.  EAPD provided legal services to BCI in connection with its corporate affairs, including without limitation the matters and transactions described herein.

3.      Upon information and belief, defendant D. Roger Glenn ("Glenn") is an individual who resides in the State of New York.  Among other things, Glenn was a Director, Chief Legal Counsel, and Corporate Secretary for BCI, and a partner in EAPD.  During the relevant time period described herein, Glenn acted as both outside counsel to BCI as well as a director and officer of BCI itself.

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a). The matter is controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between the citizens of different states.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(1) and (2) because all of the Defendants reside in this judicial district and because a substantial part of the acts or omissions giving rise to the claims asserted herein occurred in this judicial district.

## III.    GENERAL ALLEGATIONS

6.      During 2002 and 2003, several individuals and businesses discussed and ultimately negotiated a proposed joint business venture that would develop, produce, and sell natural fiber composites and related products.  These initial discussions and negotiations culminated with the formation of BCI in November 2003.

7.      The parties to these initial discussions and negotiations included the following:

(a)    Bio-Composites International, Inc. ("BioComp"), a Delaware corporation

having its principal place of business in Carlsbad, California. At all

relevant time periods, BioComp was in the business of developing,

producing, and selling natural fiber composites in the United States and

Canada. In late 2004, BioComp changed its name to BioComposites

North America, Inc. ("BCI-NA") and re-domiciled itself from Delaware to

Nevada.

(b)    David P. Saltman ("Saltman"), an individual who resides in the State of

California. At all relevant time periods, Saltman was President and CEO

of BioComp. He later became President and CEO of BCI.

(c)    Michael J. Cunningham, an individual who resides in the United

Kingdom. At all relevant time periods, Cunningham was the Chairman

and principal of three inter-related corporate entities – the Coach House

Group (UK) Ltd. ("CHG"), the Sustainable Products Development Group,

Ltd ("SPDG"), and the Sustainable Products Development Group Fibre

International, Ltd. ("SPDGFI"). At all relevant time periods, CHG owned

100% of SPDG, and SPDG owned 100% of SPDGFI. All three entities

were in the business of developing, producing, and selling natural fiber

composites. In particular, SPDGFI owned interests in companies in Spain

and South Africa that owned or intended to acquire land, manufacturing

facilities, and joint venture interests to produce and sell natural fiber

composites.

(d)    Equistar, a management and financial consulting and banking firm located

in Salt Lake City, Utah. During the time period described herein, Equistar

3

acted by and through two of its partners, Kelly Nelson ("Nelson") and Carmen Lotito ("Lotito"). Both Nelson and Lotito became shareholders, directors, and officers of BCI.

8.    As a result of these discussions and negotiations, the above parties agreed to framework under which each would contribute assets, projects, financing, and/or services to a new jointly-owned business venture. In particular, Cunningham and his UK companies agreed to contribute to the venture their interests in companies in Spain and South Africa that owned or intended to acquire land, manufacturing facilities, or joint venture interests, along with their intellectual property and knowledge relating to the bio-composites industry. These interests included: (1) 90% of a Spanish company called Kafus Internacional Espana SA which owned land suitable for the cultivation and processing of natural fibers for the composite industry (the "Spanish project"); and, (2) a one-third interest in a South African joint venture involving Brits Automotive that intended to produce and process natural fiber for the composite industry (the "South African project").

9.    On or about January 16, 2003, BioComp retained EAPD to provide general corporate and securities representation to the proposed joint venture.

10.    On or about November 24, 2003, in connection with the retention alleged in paragraph 9 above, Glenn caused the formation of BCI and filed its certificate of incorporation with the Delaware secretary of state. Glenn and EAPD prepared the corporate formation documents.

11.    On or about November 24, 2003, BCI elected and appointed Glenn as a director and as its Corporate Secretary and Chief Legal Counsel. Glenn also continued in his role as outside counsel to BCI.

4

### a. The Stock Purchase Agreement

12.     On or about November 24, 2003, Saltman and Cunningham executed a Stock Purchase Agreement by which BCI was supposed to acquire 100% of the outstanding shares of SPDGFI, thereby acquiring SPDGFI's interests in the Spanish project and the South African project. In consideration, SPDG acquired 300,000 preferred shares in BCI.

13.     The Stock Purchase Agreement was prepared and drafted by Glenn and EAPD. Glenn understood that the Stock Purchase Agreement, and in particular the acquisition of the Spanish and South African projects, was critical to BCI's operations and future success. However, Glenn had no knowledge of or experience with the purchase and sale of shares in a UK corporation. Glenn performed no research concerning the legal requirements for the purchase and sale of shares in a UK company and he never consulted with competent counsel on the requirements to transfer legal title to shares of a UK company.

14.     According to the Stock Purchase Agreement, at closing Cunningham and SPDG were supposed to deliver to BCI actual stock certificates duly endorsed or accompanied by duly executed stock powers in blank for transfer to BCI, with any required transfer tax stamps attached thereto. Although Glenn drafted the Stock Purchase Agreement and supervised the closing at the New York offices of EAPD, Glenn did not obtain for BCI either duly executed stock certificates or a duly executed stock transfer power with all required transfer tax stamps.

15.     Following the closing of the Stock Purchase Agreement, Glenn took no action to finalize BCI's acquisition of SPDGFI and he took no action to ensure that the purchase complied with the requirements of UK law to transfer title to shares of a UK company. In fact, to complete a transfer of shares of a UK company, the transferor (SPDG) must execute a stock transfer form. The transferee (BCI) must pay stamp duty on the transfer and the form must then be submitted to the target company (SPDGFI) so that its shareholder registry can be updated. If

5

a target company fails to update its shareholder registry for no valid reason, the transferee can apply to the English courts for rectification under the provisions of the UK Companies Act of 1985.

16.    As late as May 2004, Glenn acknowledged that he could not confirm BCI's ownership of 100% of SPDGFI's stock. Although BCI did eventually receive a "J30 Stock Transfer Certificate" from SPDG, Glenn took no action to obtain the required transfer tax stamp and he took no action to update SPDGFI's shareholder registry to reflect BCI's purchase of 100% of the stock.

17.    As a result of Glenn's and EAPD's failure to perform their legal services competently and with reasonable care, Cunningham and his UK companies have claimed that BCI did not in fact acquire their interests in the Spanish project and the South African project. The failure to complete the acquisition of these two projects ultimately subjected BCI to a fraud lawsuit by some its investors, and caused BCI to be unable to meet its financial obligations to certain investors.

18.    Ultimately, Cunningham caused the formation of a new UK company, SPDG Technologies, Ltd. SPDG Technologies purports to have acquired all interests in SPDGFI, including its interests in the Spanish and South African projects. Glenn and EAPD took no action to preserve and maintain BCI's interests in SPDGFI and the underlying Spanish and South African projects.

### b. BCI's Private Placement

19.    On or about November 24, 2003, BCI's board of directors, including Glenn, approved a Private Placement Memorandum dated January 15, 2004 ("PPM") for the offering of securities in BCI.

20.    Glenn and EAPD prepared and drafted the PPM.  In particular, the PPM represented that BCI had acquired SPDGFI and all of its interests in the Spanish and South African projects.  The PPM also contained a detailed use of funds statement describing how investment funds would be utilized for the benefit of BCI.

21.    On January 14, 2004, BCI filed with the SEC its Form D, Notice of Sale of Securities pursuant to Regulation D ("Form D").  The Form D filing was prepared and drafted by Glenn and EAPD.

22.    Both the PPM and the Form D contained basic misinformation and misrepresentations that exposed BCI to substantial liability and investor lawsuits.  For example, the PPM and Form D falsely identified BCI's directors, falsely stated that New York would be the only state in which BCI intended to solicit purchasers, and falsely stated that Spencer Clarke LLC would be the exclusive placement agent who would be paid for the solicitation of purchasers.

23.    On or about January 15, 2004, BCI registered its securities with the State of New York.  BCI did not register its securities in any other state.  The registration was prepared by Glenn and EAPD.

24.    On or about January 17, 2004, in contradiction to its statement in the PPM that BCI contacted Patricia G. Hughes in Denver, Colorado ("Hughes") for the purpose of soliciting her purchase of BCI securities.  Hughes had prior business contacts with some of the principals and partners in Equistar.  She was also conservator and authorized representative of her three minor children who each had substantial personal funds available for investments.

25.    Based in part on the representations in the PPM and Form D, and following her review of the loan and investment agreements, Hughes decided and agreed to invest $2 million into BCI through a series of Bridge Loan Agreements.

7

26.　　Between January 20 and January 26, on behalf of herself and her three minor children, Hughes executed five loan agreements and notes totaling $1 million. Under the terms of these notes, BCI agreed to repay all principal and interest on December 31, 2004.

27.　　On or about January 26, 2004, at the direction of Glenn, Hughes wire-transferred $200,000 directly to a bank account controlled and owned by SPDG, rather than a bank account owned and controlled by BCI or any of BCI's wholly owned subsidiaries such as SPDGFI. At the direction of Glenn, Hughes wire-transferred $800,000 to EAPD's trust account in New York.

28.　　On January 27, 2004, Glenn wire transferred $700,000 to a bank account controlled and owned by SPDG. Glenn and EAPD admittedly took no action to confirm or determine whether the bank account into which Glenn was transferring Hughes' $700,000 was under the control of BCI or whether such transfer comported with the use of funds described in the PPM. In fact, the bank account where Glenn wired the Hughes investment was controlled and owned by SPDG, which continued to maintain a separate corporate existence apart from BCI.

29.　　On February 24, 2004, on behalf of herself and her three minor children, Hughes executed a series of four Bridge Loan Agreements and notes totaling $1 million. Under the terms of these notes, BCI agreed to repay all principal and interest on December 31, 2004.

30.　　Also, on or about February 24, 2004, at the instructions of Glenn, Hughes wire transferred the second $1 million to EAPD's trust account in New York. On or about February 26, 2004, Glenn and EAPD distributed and wire transferred $800,000 to the SPDG bank account in the UK. Glenn and EAPD retained $200,000 in the law firm's trust account for the payment of legal and other services.

31.    Again, Glenn and EAPD took no action to confirm or determine whether the bank account where he was transferring Hughes' $800,000 was within the control of BCI or whether such transfer comported with the use of funds described in the PPM.

32.    The Hughes $1.7 million was used by Cunningham and the UK companies for purposes not described in the PPM and became unavailable for repayment to Hughes as required by the various notes.

33.    From about March 2004 through the end of 2004, the relations between BCI, Equistar, and Cunningham became increasingly contentious and it became difficult to agree on management plans. In particular, Cunningham complained about what he termed "excessive" fees and overhead deducted from the Hughes investment. He also complained about the lack of a professional and organized management board.

34.    At some point in 2004, in response to the apparent inability to agree on a coherent management strategy, Cunningham began to openly question whether he was properly made a director of BCI and whether BCI had actually acquired SPDGFI. Cunningham was only able to make this claim because of the failure to Glenn and EAPD to perform their legal services competently.

35.    On December 31, 2004, BCI defaulted on all of its notes to Hughes.

36.    Throughout January 2005, there were numerous discussions and meetings between Cunningham, Saltman, Nelson, Glenn, and Hughes in an attempt to re-negotiate and/or re-secure the $2 million debt. The key to all of these discussions was the land owned by the Spanish project.

37    On January 17, 2005, Cunningham sent an email to Hughes' counsel asserting that he no longer had any relationship with BCI and was never properly appointed a director.

38.    On January 17, 2005, in the context of the negotiations with Hughes and Cunningham's claim that BCI had never acquired SPDGFI, Glenn sent an email to Saltman and Nelson, which said in part:

> Another very important part of the discussions is to make sure Mike [Cunningham] understands that if the PPM we used with Patti [Hughes] is false, then he may be personally liable. He has apparently been telling Patti's lawyer that BCI never really owned SPDGFI. This is suicide for him . . . . Please try to impress this on him and leave London with copies of the documents evidencing chain of title to the Spanish project.
>
> Remind him that we have to sell this deal to Patti because if she does not take it, then she sues Mike, John [Cunningham], Tony [Lotito], Kelly [Nelson], Dave [Saltman], and me and BCI sues Mike for fraud. If she sues, then all of this inevitable. One problem we have now in selling a deal to Patti is that Mike has persuaded her lawyer that the PPM is false, so he is telling Patti that she can get her money from the individuals. We, including Mike, have to make sure that every statement in the PPM is true....

39.    Although he had a clear conflict of interest and divided loyalties at this time, Glenn remained both BCI's outside counsel and a corporate officer and director throughout 2005.

40.    The parties met in London on January 19 and 20, 2005 and purportedly agreed on a plan to move forward and secure the Hughes loan.

41.    On June 6, 2005, Glenn and EAPD sent an email to Cunningham and others demanding that they proceed with the framework agreed to in January 2005 in London. Glenn stated:

> BCI . . . still holds legal title to the Spanish project, I have conveyed to you several times since January that BCI stands ready and willing to consummate the deal that was agreed to in January in London whereby BCI would give up its rights to [SPDGFI] and contribute an interest in the American operation in exchange for your assuming the obligation to [Hughes]. As you know, it was our plan that the Spanish project be used to pay off [Hughes] and had you not offered this arrangement and Patti agreed in general

terms to go along with it, the project would have been sold to retire
debt . . . .

Please respond to [Hughes' counsel] and get things moving again.
You are leaving BCI with no alternative but to commence action to
quiet title to the Spanish project . . . and then sell it.

42.    Despite his recognition that BCI needed to take legal action to protect its interests
in the assets supposedly acquired with SPDGFI, Glenn never took any action to quiet title to the
Spanish project or otherwise protect and assert BCI's rights, title and interest in SPDGFI, the
Spanish project, and the South African project.

43.    Instead, Glenn and BCI simply allowed Cunningham and his UK companies to
obtain and/or retain clear title to SPDGFI and all of its assets and projects, including the Spanish
project and the South African project, without the payment of any consideration to BCI.  Glenn
and BCI never obtained a clear accounting from Cunningham and his UK companies of their use
of the Hughes investment.

44    On or about August 16, 2005, Cunningham caused the formation of a new
corporate entity called SPDG Technologies.  On or about September 14, 2005, SPDG
Technologies formally acquired SPDGFI and all of its assets, including the Spanish and South
African projects.

45    On November 25, 2005, SPDG Technologies was admitted to OFEX Stock
Exchange in the United Kingdom.  In its admission statement, SPDG Technologies represented
that it owned 100% of SPDGFI and through SPDGFI, it was developing the Spanish project and
the South African project.

46.    On or about May 8, 2006, on behalf of herself and her three minor children,
Hughes filed a lawsuit in the United States District Court for the Southern District of New York
against BCI and others, asserting claims against BCI for breach of contract, fraud, negligence,
negligent misrepresentation, intentional concealment/negligent nondisclosure, unjust enrichment,

civil conspiracy, respondeat superior, violation of Colorado Securities Act, avoidance of fraudulent transfers, constructive trust, and accounting (the "Hughes Lawsuit").

47.     In the Hughes Lawsuit, BCI was initially represented by EAPD.  On or about March 15, 2005, Glenn resigned as a director and officer of BCI.

48.     On or about April 11, 2006, EAPD's motion to withdraw as counsel was granted. BCI retained independent outside counsel to represent it in the Hughes Lawsuit and incurred substantial fees and costs to defend itself (both before and after EAPD withdrew as counsel) from the claims to which Glenn's and EAPD's wrongful conduct exposed it.

49.     On or about March 5, 2007, the Hughes Lawsuit was settled and BCI was required to make a substantial payment to Hughes.

### FIRST CLAIM FOR RELIEF

### (Respondeat Superior Against EAPD)

50.     Plaintiff incorporates by this reference all prior allegations.

51.     Glenn committed acts of legal malpractice and breaches of fiduciary duty, as set forth in more detail below.

52.     At all relevant times, Glenn was a partner in EAPD.   As outside counsel for BCI, Glenn's acts and omissions set forth in this Complaint were in furtherance of EAPD's business and within the scope of Glenn's authority as a partner in EAPD.

53.     According to Glenn's sworn testimony, EAPD did not have a policy, written or otherwise, that prohibited or restricted the representation of clients in which the attorney had a personal interest.

54.     Therefore, by operation of law, EAPD is responsible for Glenn's conduct and jointly and severally liable for all damages caused thereby.

## SECOND CLAIM FOR RELIEF

### (Negligent Training and Supervision Against EAPD)

55. Plaintiff incorporates by this reference all prior allegations.

56. EAPD had a duty to use reasonable care to train and supervise its attorneys to prevent those attorneys from providing incompetent and unethical legal services to EAPD clients, free of actual conflicts of interest.

57. EAPD failed to use reasonable care to train and supervise Glenn concerning conflicts of interest.

58. According to Glenn, EAPD had no policy, written or otherwise, of which Glenn was aware, that restricted his ability to assume a dual role as both outside counsel and officer/director with respect to an EAPD client. According to Glenn, EAPD took no steps to monitor and supervise Glenn to ensure that he was not improperly assuming a dual role in BCI and creating an untenable conflict of interest position.

59. It was reasonably foreseeable that the failure to train and supervise Glenn in the area of conflicts of interest and the avoidance of a dual role in firm clients would result in injury to such clients.

60. As a direct and proximate result of EAPD's failure to exercise reasonable care to train and supervise Glenn, BCI has suffered injuries, damages, and losses in an amount to be proven at trial but not less than $3,000,000.

## THIRD CLAIM FOR RELIEF

### (Negligence – Legal Malpractice Against Glenn)

61 Plaintiff incorporates by this reference all prior allegations.

62. Glenn was responsible for all of the legal work concerning the Stock Purchase Agreement, including drafting the written agreement and supervising the closing.

63.    Glenn owed a duty to BCI to act with reasonable care in relation to his legal work for BCI, and by undertaking this legal work, he impliedly represented to BCI that he had the skill, knowledge, and experience to perform these legal services.  BCI was relying on and reposing trust in Glenn's legal skill, experience, and knowledge to ensure that BCI actually acquired the assets it was attempting to purchase from Cunningham and SPDG.

64.    In connection with the Stock Purchase Agreement, Glenn failed to exercise that degree of care, skill, and diligence used by reasonably prudent attorneys generally in the community.  In particular, and without limitation, Glenn failed to adequately research and understand the requirements of UK law to transfer title to stock in a UK company; Glenn failed to obtain at the closing either duly executed stock certificates or a duly executed stock transfer power with all required transfer tax stamps; Glenn failed to pay the transfer tax; Glenn failed to submit the Stock Transfer Form to SPDGFI; Glenn failed to ensure that SPDGFI updated its shareholder registry to reflect BCI's purchase of 100% of its stock; and Glenn failed to take or recommend any action to rectify or otherwise asserts BCI's ownership of and right to control SPDGFI.

65    As a direct and proximate result of Glenn's negligent acts and omissions, BCI has suffered injuries, damages and losses, in an amount to be determined at trial but not less than $3,000,000.

## FOURTH CLAIM FOR RELIEF

### (Negligence – Legal Malpractice Against Glenn)

66.    Plaintiff incorporates by this reference all prior allegations.

67.    Glenn was responsible for the disbursement of the $2 million Hughes investment, the bulk of which was deposited in EAPD's New York trust account, and he was responsible for

ensuring that the funds disbursed from his trust account remained under the ownership and control of BCI and/or comported with the written use of funds instructions set forth in the PPM.

68.     Glenn owed a duty to BCI to act with reasonable care in relation to his legal work for BCI, and by undertaking this legal work, he impliedly represented to BCI that he had the skill, knowledge, and experience to perform these legal services.  BCI was relying on and reposing trust in Glenn's legal skill, experience, and knowledge to ensure that the Hughes investment funds deposited in EAPD's trust account would be disbursed with reasonable care in compliance with the written use of fund instructions and for the benefit of BCI.

69.     In connection with the disbursement of the Hughes investment, Glenn failed to exercise that degree of care, skill, and diligence used by reasonably prudent attorneys generally in the community.  In particular, and without limitation, Glenn failed to perform any due diligence concerning the UK bank account where he wire transferred the bulk of the Hughes investment to ensure that it was an account controlled by BCI and he failed to monitor or control these funds, once disbursed, to ensure that they were used in accordance with the written use of funds instructions set forth in the PPM and for the benefit of BCI.

70.     As a direct and proximate result of Glenn's negligent acts and omissions, BCI has suffered injuries, damages, and losses in an amount to be determined at trial but not less than $3,000,000.

## FIFTH CLAIM FOR RELIEF

### (Negligence – Legal Malpractice Against Glenn)

71     Plaintiff incorporates by this reference all prior allegations.

72     Glenn was responsible for all legal work concerning BCI's private securities offering, including supervising the drafting of the private placement memorandum and related

Form D disclosure statement filed with the SEC in January 2004. He was also responsible for completing all necessary state registrations in connection with BCI's private offering.

73. Glenn owed a duty to BCI to act with reasonable care in relation to his legal work for BCI, and by undertaking this legal work, he impliedly represented to BCI that he had the skill, knowledge, and experience to perform these legal services. BCI was relying on and reposing trust in Glenn's legal skill, experience, and knowledge to ensure that BCI's PPM and Form D disclosure was truthful, accurate, and complied with all legal requirements.

74. In connection with BCI's private securities offering, Glenn failed to exercise that degree of care, skill, and diligence used by reasonably prudent attorneys generally in the community. In particular, and without limitation, the PPM and Form D disclosure contained basic misinformation and misrepresentations that exposed BCI to substantial liability from its investors. Glenn also failed to register BCI's securities in any state other than New York, even though the Hughes family lives in Colorado and was solicited in that state.

75. As a direct and proximate result of Glenn's negligent acts and omissions, BCI has suffered injuries, damages, and losses in an amount to be proven at trial but not less than $3,000,000.

## SIXTH CLAIM FOR RELIEF

### (Negligence – Legal Malpractice Against Glenn)

76. Plaintiff incorporates by this reference all prior allegations.

77. Glenn was responsible for advising BCI of all of its potential rights and remedies concerning its interests in the Spanish project and the South African project supposedly acquired by the Stock Purchase Agreement and he was responsible for protecting and preserving BCI's interests in these two projects.

78.    Glenn owed a duty to BCI to act with reasonable care in relation to his legal work for BCI, and by undertaking this legal work, he impliedly represented to BCI that he had the skill, knowledge, and experience to perform these legal services. BCI was relying on and reposing trust in Glenn's legal skill, experience, and knowledge to protect and preserve its interests in the Spanish project and the South African project.

79.    In connection with his duty to protect and preserve BCI's assets, Glenn failed to exercise that degree of care, skill, and diligence used by reasonably prudent attorneys generally in the community. In particular, and without limitation, Glenn did not properly assess the legal situation once Cunningham asserted ownership of the two projects; he did not properly and meaningfully advise BCI about how to protect these assets; and, he took no legal action to protect and preserve BCI's interests in the Spanish project and the South African project, despite being aware that such action needed to be taken.

80.    As a direct and proximate result of Glenn's negligent acts and omissions, BCI has suffered injuries, damages, and losses in an amount to be proven at trial but not less than $3,000,000.

### SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against Glenn)

81.    Plaintiff incorporates by this reference all prior allegations.

82.    As the attorney and outside counsel for BCI, Glenn stood in a fiduciary relationship to his client, and therefore owed BCI the highest degree of undivided loyalty.

83.    As its attorney and outside counsel, BCI placed special trust and confidence in Glenn to exercise discretion and expertise only for the benefit of BCI.

84    As described herein, Glenn breached his duty of undivided loyalty and created an inherent conflict of interest when he assumed a personal business interest in his client by

accepting appointment as a director and officer of BCI while at the same time remaining in his role as its outside counsel.

85.    As alleged above, in or about January 2005 Glenn acknowledged that he could be personally sued in relation to Hughes investment and the botched purchase of the Spanish and South African projects. In the context of the negotiations with Hughes' and Cunningham's claim that BCI had never acquired SPDGFI, Glenn sent an email to Saltman and Nelson, which said in part:

> Another very important part of the discussions is to make sure Mike [Cunningham] understands that if the PPM we used with Patti [Hughes] is false, then he may be personally liable. He has apparently been telling Patti's lawyer that BCI never really owned SPDGFI. This is suicide for him . . . . Please try to impress this on him and leave London with copies of the documents evidencing chain of title to the Spanish project.
>
> *Remind him that we have to sell this deal to Patti because if she does not take it, then she sues Mike, John [Cunningham], Tony [Lotito], Kelly [Nelson], Dave [Saltman], and me and BCI sues Mike for fraud. If she sues, then all of this inevitable.* One problem we have now in selling a deal to Patti is that Mike has persuaded her lawyer that the PPM is false, so he is telling Patti that she can get her money from the individuals. We, including Mike, have to make sure that every statement in the PPM is true . .
> . .

(emphasis added).

86.    Because of his divided loyalties and conflict of interest, Glenn could not and did not provide full, professional, and competent legal advice to BCI.

87.    Glenn's conduct and conflict position violated at least two Disciplinary Rules applicable to the legal profession – DR 5-101 (Conflict of Interest) and DR 5-104 (Transactions between Lawyer and Client).

88.    Glenn's breach of his fiduciary duties and conflict of interest warrants disgorgement of fees EAPD received in connection with the matters alleged above in an amount to be proven at trial, but not less than $300,000.

## EIGHTH CLAIM FOR RELIEF

### (Indemnification against EAPD and Glenn)

89.    Plaintiff incorporates by this reference all prior allegations.

90.    EAPD was entirely at fault for the substantial fees and damages BCI incurred in connection with, among other things, the defense and settlement of the Hughes Lawsuit.

91    As a direct and proximate result of the actions of EAPD and Glenn alleged above, BCI was forced to and did incur substantial fees and damages BCI incurred in connection with, among other things, the defense and settlement of the Hughes Lawsuit.

92    EAPD and Glenn are jointly and severally liable to indemnify BCI for the full extent of any such liability, in an amount to be proven at trial but not less than $3,000,000.

## NINTH CLAIM FOR RELIEF

### (Unjust Enrichment against EAPD)

93    Plaintiff incorporates by this reference all prior allegations.

94.    EAPD has been unjustly enriched at the expense of BCI and, among other things, is liable to return all fees paid to it in connection with the matters alleged above, in an amount to be to be proven at trial, but not less than $300,000.

WHEREFORE, Plaintiff requests the following relief:

(1)    On the First Claim for Relief against EAPD, judgment against EAPD, and an Order that EAPD be jointly and severally liable for all damages and other relief awarded to Plaintiff in this action; and

(2)    On the Second Claim for Relief against EAPD, judgment against EAPD, damages in an amount to be determined at trial, but not less than $3,000,000; and

(3)    On the Third, Fourth, Fifth, and Sixth Claims for Relief against Glenn, judgment against Glenn and EAPD jointly and severally, damages in an amount to be determined at trial, but not less than $3,000,000; and

(4)    On the Seventh Claim for Relief against Glenn, judgment against EAPD and Glenn jointly and severally, and damages including disgorgement of all fees paid by Plaintiff to EAPD in connection with EAPD's and Glenn's representation of BCI in the matters at issue; and

(5)    On the Eighth and Claim for Relief against EAPD and Glenn, judgment against Glenn and EAPD jointly and severally, damages in amount to be determined at trial, but not less than $3,000,000; and

(6)    On the Ninth Claim for Relief against EAPD, judgment against EAPD, and damages including disgorgement of all fees paid by Plaintiff to EAPD in connection with EAPD's representation of BCI in the matters at issue; and

(7)    Pre-judgment interest on all claims; and

(8)    Post-judgment interest on all claims; and

(9)    Costs, disbursements and attorney's fees incurred by Plaintiff in connection with this action; and

(10)    Such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a jury on all claims.

Dated: New York, New York
       May 17, 2007

               **FRANKFURT KURNIT KLEIN & SELZ P.C.**

               By: _____

                  Ronald C. Minkoff (RM-2943)
                  Jessie F. Beeber (JB-3129)
                  Lia N. Brooks (LB-0618)

                  488 Madison Avenue, 10th Floor
                  New York, New York  10022
                  Telephone:  (212) 980-0120
                  Facsimile:  (212) 593-9175
                  E-mail:  rminkoff@fkks.com
                  E-mail:  jbeeber@fkks.com
                  E-mail: lbrooks@fkks.com

                  *Attorneys for BCI International Holdings, Inc.*